UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JOHN HANCOCK LIFE INSURANCE
COMPANY,

       Plaintiff,                                   04 CV 98 (NG) (MDG)

  - against -

EUGENE PERCHIKOV, a/k/a EYAL SHAHAR;
THE ESTATE OF LARYSSA VASSERMAN;
and ELIZABETH CATCHALOVA,
Administratrix of the Estate of Laryssa
Vasserman,

                                                              **OPINION & ORDER**

       Defendant.
------------------------------------------------------------------x
**GERSHON, United States District Judge:**

       Plaintiff John Hancock Life Insurance Company ("John Hancock") brings this action to rescind a policy of life insurance issued to Laryssa Vasserman, the decedent, alleging that Ms. Vasserman made material misrepresentations in her application for the policy. Elizabeth Catchalova, the administratrix of Ms. Vasserman's estate, counterclaims against John Hancock for wrongful death and seeks payment of the policy's proceeds on behalf of Ms. Vasserman's estate claiming (1) that the designated beneficiary, Eugene Perchikov, procured the policy with the premeditated intent to murder Ms. Vasserman and (2) that John Hancock's negligent issuance of the insurance policy was the proximate cause of Ms. Vasserman's death. Jurisdiction in this case is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

       John Hancock now moves for summary judgment as to its rescission claim, arguing that the insurance policy is void *ab initio* (1) because Ms. Catchalova alleges that the policy issued by John

1

Hancock was procured by Perchikov with an intent to defraud John Hancock and murder Ms. Vasserman and (2) because Ms. Vasserman made material misrepresentations in her policy application about her income and occupation and about the existence of other life insurance policies in force at the time of her application.

**FACTS**

Unless otherwise indicated, the following facts are undisputed.

Laryssa Vasserman, along with her daughter Elizabeth (Yelizaveta) Klyuchnikova, emigrated from the Ukraine to Brooklyn, New York in 1999. Upon arriving in the United States, Ms. Vasserman could not understand, speak, or write English and could speak and understand only the Russian language. Catchalova Aff., ¶¶ 7, 8.

Although she remained married to a man named Alexander Vasserman from 1999 to the date of her death in 2002, Ms. Vasserman separated from Mr. Vasserman in early 2000 and lived apart from him thereafter. Catchalova Aff., ¶ 9. Soon after separating from her husband, Ms. Vasserman met Eugene Perchikov, also known as Eyal Shahar, in Brooklyn, New York. Catchalova Aff., ¶ 10. Mr. Perchikov resided in Israel but frequently traveled to the United States and stayed with Ms. Vasserman during these visits. Catchalova Aff., ¶ 11. On several occasions, Mr. Perchikov told Ms. Vasserman and others that, if anything happened to Ms. Vasserman, Mr. Perchikov would take care of Ms. Vasserman's daughter. Abmetko Aff., ¶ 9; Catchalova Aff., ¶ 12.

Shortly after meeting Mr. Perchikov, Ms. Vasserman applied for life insurance with many different insurance companies, including John Hancock. Two years after obtaining the various insurance policies described below, Ms. Vasserman told a friend that she had procured life insurance to benefit her daughter, but that she wanted to change the beneficiary on the policy to her sister or

someone else because she was concerned that her daughter would be unable to handle the money. Abmetko Aff., ¶ 11. On September 19, 2000, Ms. Vasserman applied to Allstate Life Insurance Company of New York ("Allstate") for a $1.5 million policy of life insurance, listing Ms. Vasserman's sister Irena Esina as primary beneficiary and Ms. Vasserman's daughter Elizabeth as contingent beneficiary.[1] Debrot Aff., Ex. A. During the fall of 2000 Ms. Vasserman also applied for, and was issued, a $1 million life insurance policy from Metropolitan Life Insurance Company ("MetLife"). Debrot Aff., Ex. B. In addition, Ms. Vasserman applied for and was issued a $1 million life insurance policy from Union Central Life Insurance Company ("Union"); this policy listed Alexander Vasserman as Ms. Vasserman's "husband" and primary beneficiary. Debrot Aff., Ex. C. Lastly, around the same time as her insurance applications to Allstate, Metropolitan, and Union, Ms. Vasserman applied for and was issued a $1 million life insurance policy from John Hancock that listed Eugene Perchikov as Ms. Vasserman's "husband" and primary beneficiary. Flaherty Aff., Ex. 5.

Because the John Hancock life insurance policy that was issued in the fall of 2000 lapsed as a result of non-payment of premiums in early 2001, Ms. Vasserman applied for a *new* $1 million life insurance policy from John Hancock in October 2001–this time listing Eugene Perchikov as Ms. Vasserman's "cousin" and primary beneficiary. Debrot Aff., Ex. F (Clancy Dep., 75); Flaherty Aff,

---

[1] For reasons not entirely clear from the record, Ms. Vasserman later requested in November 2000 that her Allstate application be withdrawn. A November 29, 2000 letter from Allstate, addressed to Ms. Vasserman, states "We are withdrawing your application as you requested. Our decision was based on information in a consumer report made at our request by Choice Point Insurance Consumer Center . . . . Information concerning the nature and scope of the consumer report requested may be obtained by sending us a written request."

Ex. 1. It is the second John Hancock policy, issued to Ms. Vasserman in October 2001, that is the subject of the present litigation.

Ms. Vasserman's October 2001 application to John Hancock, as well as her previous John Hancock application, stated that Ms. Vasserman was self-employed as an artist making more than $100,000 a year and that Ms. Vasserman did not have any other life insurance in force at the time of her application. Flaherty Aff., Ex. 1. Based on the fact that Mr. Perchkov accompanied Ms. Vasserman when meeting with John Hancock agents during the application process, Debrot Aff., Ex. L (Clancy Dep., 49 ), and Ms. Vasserman's inability to communicate in English, Catchalova Aff., ¶ 8, Ms. Catchalova argues in her brief that it must have been Mr. Perchikov who provided information to John Hancock's agent and determined the application's actual contents.

Mr. Perchikov paid the premiums on the 2001 John Hancock policy from the time that the policy was issued until Ms. Vasserman died on November 19, 2002. Because Ms. Vasserman died within two years of the issuance of the policy, John Hancock conducted a routine claim investigation after receiving a Claimant's Statement executed by Mr. Perchikov. The Claimant's Statement executed by Mr. Perchikov requested payout of the policy's benefits and included a death certificate listing Ms. Vasserman's cause of death as "small coronary artery disease." Flaherty Aff., Ex. 3. It was during the course of its investigation that John Hancock asserts it learned for the first time that Ms. Vasserman had two other million-dollar life insurance policies that had been in force at the time she applied for life insurance coverage with John Hancock. Flaherty Aff., Ex. 5, 6, 7, 9. Furthermore, through its investigation, John Hancock claims that it discovered for the first time that Ms. Vasserman was employed as a "home attendant" for Bhrags Housekeeping, earning less than $20,000 annually. Flaherty Aff., Ex. 3, 16. Based on its investigation and its belief that it never

4

would have issued the insurance policy if Ms. Vasserman's application had accurately represented her income, occupation, and other existing insurance, John Hancock refused to pay out benefits either to Mr. Perchikov or to Ms. Vasserman's daughter. Flaherty Aff., Ex. 14. Instead, John Hancock simply tendered a check to Mr. Perchikov returning the amount of money that he had already paid in premiums for the policy. Flaherty Aff., Ex. 11-13.

Arguing that the 2001 insurance policy is void *ab initio* (1) because Ms. Catchalova alleges that the policy issued by John Hancock was procured by Perchikov with an intent to defraud John Hancock and murder Ms. Vasserman, and (2) because Ms. Vasserman made material misrepresentations in her policy application about her income and occupation and about the existence of other life insurance policies in force at the time of her application, John Hancock now moves for summary judgment.[2]

## DISCUSSION

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995). The moving party must demonstrate the absence of any material factual

---

[2] In parallel litigation in New York state court, the Supreme Court for the County of Kings granted summary judgment to John Hancock as to Ms. Vasserman's wrongful death claim, *Katchalova v. Borger*, 7 Misc. 3d 966 (2005), which decision was on appeal at the time that John Hancock requested leave to move for summary judgment in the present federal action. Because of the pendency of the appeal in New York state court, this court directed John Hancock to move for summary judgment only as to its claim for rescission of the insurance policy. At oral argument before this court, counsel for Ms. Catchalova indicated that the Appellate Division had affirmed the Supreme Court's decision granting summary judgment to John Hancock as to Ms. Vasserman's wrongful death claim, *Katchalova v. Perchikov*, 43 A.D.3d 873 (2d Dept. 2007), and represented that Ms. Catchalova would not pursue her wrongful death counterclaim in this court once the issue had been decided definitively against them in state court. Transcript of January 17, 2008 Oral Argument, p. 3.

issue genuinely in dispute. *Id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

I. **Whether Ms. Vasserman's Insurance Policy is Void *Ab Initio* If Procured With the Intent to Murder Ms. Vasserman[3]**

John Hancock's first argument–that Ms. Vasserman's insurance policy is void *ab initio* because it was procured with the intent of murdering Ms. Vasserman–does not warrant summary judgment. In situations where a beneficiary procures a life insurance policy with the intent of murdering the insured, New York law clearly indicates that, "[i]n order to avoid payment of the policy proceeds, the [insurance company] must establish by proof of extrinsic facts that the decedent had *no independent motivation* to insure her own life, and that her *sole* motivation for procuring the insurance was supplied by the beneficiary who planned the murder." *Estate of Grieco v. Bankers Am. Life Assurance Co.*, 251 A.D.2d 446, 447 (2d Dept.1998) (internal citations omitted) (emphasis added). In *Grieco*, the insurance company sought to avoid paying policy proceeds to the decedent's

---

[3] Ms. Catchalova contends that John Hancock should not be permitted to move for summary judgment on this basis–that the policy is void *ab initio* if procured with intent to murder the insured–because John Hancock did not raise this argument in its complaint and instead only argued in its complaint that the policy is void *ab initio* because of material misrepresentations. This contention is meritless. It was Ms. Catchalova who raised the specter of Mr. Perchikov's murderous scheme in her answer and counterclaims and, in any event, the court would grant John Hancock leave to amend its pleading pursuant to Federal Rule of Civil Procedure 15.

estate based on its contention that the decedent's husband procured the insurance as part of a fraudulent scheme to murder the decedent. *Id.* Although the New York state trial court granted summary judgment to the insurance company on this basis, the Appellate Division reversed this decision, noting that "[o]ne could infer from the evidence submitted by the defendant in support of its motion for summary judgment that the decedent did, indeed, procure the insurance for her own purposes, to wit, to preserve her home and support her family." *Id.* The evidence that supported decedent's independent purpose for procuring the insurance policy was as follows: "the insurance policy went into effect with a mortgage procured by [the decedent and her husband and,] [a]t the time of her death, the decedent . . . held other insurance on her life, presumably for her own purposes, and was the primary source of support of herself and her family, which included a daughter and infant granddaughter . . ." *Id.*

In the present case, Ms. Vasserman had a minor daughter at the time that she applied for life insurance with John Hancock. Ms. Vasserman told her friend, Mr. Abmetko, that she had purchased life insurance to benefit her daughter, and the record indicates that Mr. Perchikov told Ms. Vasserman multiple times that, if anything ever happened to Ms. Vasserman, Mr. Perchikov would help take care of her daughter.[4] Abmetko Aff. ¶ 9; Catchalova Aff ¶ 12. Although Ms. Catchalova

---

[4] These statements, contrary to John Hancock's argument, are not hearsay as they are offered to show Ms. Vasserman's state of mind at the time that she applied for the insurance policy. The relevance of the statements is based on the fact that the statements were made to Ms. Vasserman, not that Mr. Perchikov was being truthful when making the statements. Furthermore, Ms. Vasserman's statement to Mr. Abmetko is not hearsay because it is not offered to show that Ms. Vasserman actually procured insurance naming her daughter as primary beneficiary–the record clearly reflects that this is not the case. Rather, the statement is admissible to show Ms. Vasserman's state of mind, what she believed she was doing in applying for the insurance policies.

John Hancock's argument that these affidavits do not satisfy the requirements of Rule 56–because they speculate as to Ms. Vasserman's motive–is unavailing. These affidavits do not

alleges in her pleadings that Mr. Perchikov urged Ms. Vasserman to procure the insurance policy with the intent of murdering Ms. Vasserman, there is *also* sufficient evidence to support the inference that Ms. Vasserman procured the insurance for her own purposes, *i.e.*, to provide for her daughter, and John Hancock has failed to show that the *sole* reason for procuring the insurance was as part of a fraudulent scheme to murder the insured.

John Hancock argues unpersuasively that *Grieco* does not apply to the present situation. Because of Mr. Perchikov's offer to care for Ms. Vasserman's minor daughter in the event that anything should happen to Ms. Vasserman, it is not determinative that Mr. Perchikov, not Ms. Vasserman's daughter, was listed as primary beneficiary on the John Hancock policy. Nor does the fact that Ms. Vasserman purchased the insurance *after* meeting Mr. Perchikov eliminate the possibility that Ms. Vasserman sought insurance to benefit her daughter. Similarly, that the yearly premiums in this case were equal to Ms. Vasserman's salary does not eliminate the inference that Ms. Vasserman had an intention to provide for her daughter separate and apart from any fraudulent scheme of Mr. Perchikov. Far from eliminating the inference that Ms. Vasserman procured the insurance for her own independent reasons, Mr. Perchikov's willingness to pay large sums of money on Ms. Vasserman's behalf can be interpreted as supporting the inference that Ms. Vasserman believed that Perchikov actually meant to carry through on his promise to care for Ms. Vasserman's daughter.

---

speculate as to Ms. Vasserman's motive. Rather, these affidavits relate to what the affiant heard Mr. Perchikov tell Ms. Vasserman. From the *facts* outlined in the affidavits, the court finds that an inference arises that Ms. Vasserman indeed may have had an independent reason to procure the insurance policy, which is a triable issue of material fact.

8

Furthermore, John Hancock's reliance on *Goldstein v. New York Life Ins. Co.*, 225 A.D. 642 (1st Dept.1929), is misplaced. Although the *Goldstein* decedent was murdered by the beneficiary, just as Ms. Catchalova alleges in the present case, the *Goldstein* decedent initially conspired with the beneficiary to procure the insurance and then fake his own death. Accordingly, the *Goldstein* decedent clearly did not procure the insurance policy for any purpose independent of a scheme to defraud the insurance company. In its reply memorandum, John Hancock contends for the first time that Ms. Vasserman must have been a participant in Mr. Perchikov's fraudulent scheme. This contention fails to establish that summary judgment is warranted. At best, the record includes some evidence suggesting that Ms. Vasserman may have been complicit in some aspects of the present insurance fraud. However, the record is far from clear on this point, and resolving all ambiguities in favor of the non-moving party, the court finds that there is an issue of fact as to whether Ms. Vasserman was a participant in Mr. Perchikov's fraud.[5] Furthermore, although John Hancock contends that Ms. Catchalova cannot assert *both* that Mr. Perchikov urged Ms. Vasserman to obtain

---

[5] Ms. Vasserman, according to John Hancock, apparently applied for life insurance at a different company, MetLife, unaccompanied by Mr. Perchikov. John Hancock argues that this shows that Ms. Vasserman must have been in on a scheme to defraud the insurance companies because Ms. Vasserman misrepresented her income and occupation during the MetLife application process and did so without the help of Mr. Perchikov. Notably, however, the MetLife agent's report summarizing this application process describes Ms. Vasserman as "petite," 120 pounds and 5 foot 4 or 5 foot 5. Debrot Aff., Ex. I. In every other place in the record where Ms. Vasserman's height and weight are described, Ms. Vasserman was noted to be 5 foot 10 or 5 foot 9 and 140 pounds. Debrot Aff., Ex. A, D, T. Adding yet another twist to this strange situation, the 5 foot 4 woman who claimed to be Ms. Vasserman listed one "Irina Esina" as sister and primary beneficiary on the MetLife application. In fact, Ms. Vasserman had no sister named "Irina Esina" and this person appears to be an entirely made-up character. Based on this record, and resolving all ambiguities in favor of the non-moving party, it remains an open question as to whether Ms. Vasserman was actually the woman who appeared before the MetLife agent and provided inaccurate information regarding her income and occupation.

the policy *and* that Ms. Vasserman obtained the policy for her own independent reasons, it is clear that the record could support a scenario that is consistent with both theories.[6]

II. **Whether Ms. Vasserman's Insurance Policy is Void *Ab Initio* Because of Material Misrepresentations in her Application**

John Hancock next argues that Ms. Vasserman's insurance policy is void *ab initio* because it contained material misrepresentations with regard to her occupation, earnings, and the existence of other life insurance policies in force at the time of her application to John Hancock. Under New York law, an insurance policy is considered void *ab initio* if the insured made misrepresentations to the insurance company that were material to the issuance of the policy. *Chicago Ins. Co. v. Kreitzer & Vogelman*, 265 F.Supp.2d 335, 342-43 (S.D.N.Y. 2003). "The failure to disclose is as much a misrepresentation as a false affirmative statement," and misrepresentations are considered material if the insurer can show "that the misrepresentation induced it to accept an application that it might otherwise have refused." *Id.* It is the applicant's duty to disclose all facts bearing on or pertaining to the insurability of his life, and even innocent misrepresentations, if material, are sufficient to void a contract of life insurance. *Id.* Furthermore, an insured's assertion that she does not understand the English language is insufficient to excuse the insured's misrepresentations to an insurance company. *Koloski v. Metropolitan Life Ins. Co.*, 2004 WL 2903626 at *3 (N.Y. Sup. Ct. 2004) ("Under New York law, a claim of illiteracy in the English language is, by itself, insufficient

---

[6] For example, the record could easily support a scenario in which Mr. Perchikov, as Ms. Vasserman's friend, urged Ms. Vasserman to apply for life insurance for the protection of her minor daughter all the while intending to trick Ms. Vasserman by mistranslating the substance of her application, naming himself as primary beneficiary, and then murdering Ms. Vasserman. Such a scenario is consistent both with Ms. Catchalova's argument that Mr. Perchikov intended to commit fraud and with Ms. Catchalova's argument that Ms. Vasserman was an innocent instrumentality of Mr. Perchikov's fraud.

10

to avoid the rule that a party who signs a contract without any valid excuse for failing to read it is conclusively bound by its terms."); *See also Maines Paper & Food Serv. v. Adel*, 256 A.D.2d 760 (3rd Dept. 1998) ("In the absence of fraud, duress or some other wrongful act by a party to a contract, a signer of an agreement is deemed to be conclusively bound by its terms whether or not he or she read it . . . [and] an inability to understand the English language, without more, is insufficient to avoid this general rule").

It is undisputed that Ms. Vasserman's insurance application to John Hancock listed her occupation as a self-employed artist earning more than $100,000 per year even though Ms. Vasserman's true occupation was as a home attendant making less than $20,000 per year. It is also undisputed that Ms. Vasserman's application indicated that no other life insurance policies were in force at the time of her application even though Ms. Vasserman actually had at least two other million-dollar life insurance policies in force at that time. Nonetheless, Ms. Catchalova asserts that Ms. Vasserman's insurance policy should not be deemed void *ab initio* because (1) summary judgment based on material misrepresentations in an insurance policy is inappropriate where the insurer has not established that the application was attached to the policy when it was issued and (2) these misrepresentations were not material.

  A. <u>The Attachment of the Application</u>

Ms. Catchalova argues that John Hancock has failed to establish that a copy of Ms. Vasserman's application was attached to Ms. Vasserman's policy when issued and, therefore, John Hancock would be unable to introduce the application as evidence to prove that the application contained misrepresentations. Ms. Catchalova further argues that, because John Hancock cannot introduce evidence of the application to show that the application contained misrepresentations, John

Hancock's summary judgment motion must fail. Ms. Catchalova correctly cites the relevant provision of New York law that "[n]o application for the issuance of [a life insurance] policy or contract shall be admissible in evidence unless a true copy was attached to such policy or contract." N.Y. INSURANCE LAW § 3204. However, Ms. Catchalova's argument is ultimately unpersuasive because the record evidence in this case reveals no genuine issue of fact as to whether the application was attached to Ms. Vasserman's policy.

Testimony by an insurance company's employees about the "customary office procedure on the part of the [insurance company] in putting together and mailing out a copy of the policy" is "sufficient to raise a presumption of proper mailing," and mere denial of receipt by the insured, without more, is insufficient to rebut this presumption.[7] *31-33 Lenox Ave. Wine & Liquor v. Brueckner New York Prop. Ins. Underwriting Assoc.*, 185 A.D.2d 762, 763 (1st Dept. 1992); *see Badio v. Liberty Mut. Fire Ins. Co.*, 12 A.D.3d 229, 231 (1st Dept. 2004). Before the court in the

---

[7]Ms. Catchalova's case citations to the contrary involve cases factually distinct from the present situation. For example, Ms. Catchalova cites to three cases in which, unlike the present situation, there was no dispute about whether the application was sent to the insured individual. *See Massachusetts Cas. Ins. Co. v. Morgan*, 886 F.Supp. 1002, 1004 (E.D.N.Y. 1995) (noting that "it is undisputed that Massachusetts Casualty did not provide the reinstatement application" to the insured and that the issue is instead whether the statute requires delivery to the individual insured in this particular situation); *Gozan v. Mut. Life Ins. Co. of New York*, 40 N.Y.2d 707, 710 (1976) (noting that the only issue was "whether the copy of the [attached] application . . . was legible . . . ," not whether the application was attached); *Cutler v. Hartford Life Ins. Co.*, 22 N.Y.2d 245, 248 (1968) (rejecting the contentions that an insurer is required only to deliver a copy of the application to an insured's group policyholder and that an insurer is not required to deliver a copy of the insurance application to the individual insured). Ms. Catchalova also cites cases in which courts have engaged in determining the substantive terms of "lost policies," decisions that involve analyses and standards far different from simply determining whether–without regard to the policy's substantive terms–an application was physically attached to a policy at the time that the policy was issued. *See Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83 (2d Cir. 2002); *Gold Fields American Corp. v. Aetna Cas. and Sur. Co. et al.*, 173 Misc. 2d 901 (1997).

present case are the affidavit and deposition testimony of Magdalena Jones, a John Hancock employee responsible for overseeing the compilation, assembly, and final production of the various policy pages and forms that are issued for delivery to insured individuals. Jones Aff., ¶ 1. According to Ms. Jones, "it has been and remains John Hancock's business practice to append the application pages" to the insured's policy and "[w]ithout exception this practice and procedure is followed in all situations" involving the issuance of life insurance policies. Jones Aff., ¶ 2. Ms. Jones testified at her deposition that a machine assembles each insurance policy and appends a copy of the relevant insurance application to each policy that John Hancock issues. This machine will stop running if an insurance application is missing, Jones Dep. 54, and every fifth policy is hand-checked to ensure that the relevant application is correctly attached. Jones Dep. 35-38. Based on the procedures just described, Ms. Jones testified that, in accordance with John Hancock's policies, Ms. Vasserman's application would have been appended to Ms. Vasserman's policy and sent to Ms. Vasserman at the time that her policy was issued. Jones Aff., ¶ 3, 4; Jones Dep. 56. As in *Lennox*, John Hancock has presented evidence sufficient to raise the presumption, based on its normal business practices, that Ms. Vasserman's application was attached to her policy at the time that it was issued. To rebut this presumption, Ms. Catchalova merely asserts that she has been unable to locate Ms. Vasserman's copy of the policy among Ms. Vasserman's possessions, and therefore she cannot tell whether the application was attached. As in *Lennox*, Ms. Catchalova's denial of receipt, without more, is insufficient to rebut the presumption that John Hancock attached the application.

Ms. Catchalova also speculates that a policy might be assembled without a properly attached application despite all of the precautions taken by John Hancock. However, such speculation is insufficient, without more, to raise a genuine issue of material fact about whether Ms. Vasserman's

application was attached to Ms. Vasserman's policy at the time that it was issued. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment, therefore, nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated speculation.") (internal citations and quotations omitted). Furthermore, after careful review, the court finds Ms. Jones's affidavit and deposition testimony consistent. Accordingly, Catchalova's speculation about Ms. Jones's credibility–based on nonexistent inconsistencies between her affidavit and deposition testimony–is unsubstantiated and insufficient to raise an issue of material fact.

> B.  Whether the Misrepresentations Were Material

Ms. Catchalova next argues that the misrepresentations included in Ms. Vasserman's application could not have been material because the evidence establishes a genuine issue of material fact as to whether John Hancock issued Ms. Vasserman's insurance policy despite knowing of the misrepresentations included in Ms. Vasserman's application. It is true that, under New York law, "[n]o misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to refusal by the insurer to make such contract." N.Y. INSURANCE LAW § 3105(b). However, John Hancock has established that it did not know Ms. Vasserman already had two other million-dollar life insurance policies in force at the time that it issued Ms. Vasserman's policy and that it would not have issued Ms. Vasserman's policy if it had known of these other insurance policies. Ms. Catchalova has failed to raise a genuine issue of material fact in this regard.

i. Ms. Vasserman's other insurance – John Hancock's lack of knowledge

In her initial brief in opposition to summary judgment, Ms. Catchalova argued that Ms. Vasserman's misrepresentation about the existence of other life insurance was immaterial because, at the time that it issued Ms. Vasserman's policy, John Hancock knew about this insurance as a result of a Medical Information Bureau ("MIB") report. However, the MIB report, which John Hancock attached to its reply brief, did not indicate the existence of any other insurance in force at the time of Ms. Vasserman's application to John Hancock. Rather, the MIB report and all other documents included in John Hancock's underwriting file indicated only that Ms. Vasserman had *applied* for life insurance elsewhere at an earlier date, Duggan Aff., ¶¶ 8, 9, Ex. 5, a practice that John Hancock asserts is common when applicants are shopping for the best deal, and did not indicate that other life insurance had actually been *issued*. *Id.* Nevertheless, because Ms. Catchalova had not yet conducted depositions on this issue, the court allowed Ms. Catchalova the opportunity to depose Patricia Duggan, the John Hancock employee responsible for underwriting Ms. Vasserman's insurance policy, and directed the parties to submit supplemental briefing if necessary. Despite this expanded opportunity to conduct discovery, Ms. Catchalova has not contested John Hancock's assertion that the MIB report contains no indication of the existence of any other insurance in force at the time of Ms. Vasserman's application to John Hancock.

Furthermore, John Hancock asserted in its reply brief, which assertion Ms. Catchalova did not rebut in her supplemental brief, that Ms. Vasserman's application to another insurance company did not create notice or a duty on John Hancock's part to conduct further inquiries. John Hancock Reply Br., 25-30. "An insurer is not required to verify or investigate information provided by an insured," *Chicago Ins. Co. v. Kreitzer & Vogelman*, 265 F.Supp.2d 335, 344 (S.D.N.Y. 2003), and

15

"[t]he fact that the [insurance company] conducted a preliminary examination of the insured, did not relieve the insured of his obligation to answer questions on the application truthfully." *Friedman v. Prudential Life Ins. Co. of America*, 589 F.Supp. 1017, 1024-25 (S.D.N.Y.) "Only if the examination uncovers a falsity or facts which reasonably place it under a duty to make further inquiry does the examination infringe upon the insurer's right to avoid the policy." *Id.* (internal citations and quotations omitted). Patricia Duggan testified, and Ms. Catchalova does not dispute, that it is common for applicants to apply for life insurance at more than one company when shopping for the best deal, and it is therefore not uncommon for an MIB report to note that an applicant had applied to another insurer seeking issuance of a policy. Duggan Aff. ¶ 17. Moreover, nothing in the MIB report contradicted the misrepresentation in Ms. Vasserman's application that Ms. Vasserman had no other life insurance currently in force. *See* Duggan Aff. ¶ 8. That Ms. Vasserman had once *applied* for insurance with another insurer did not put John Hancock on notice that Ms. Vasserman had been *issued* two other million-dollar insurance policies that were still in force. In sum, John Hancock has established that it had neither actual knowledge of the other insurance policies in force at the time of Ms. Vasserman's application nor a duty to conduct further investigation to determine if such policies existed, and Ms. Catchalova has failed to raise a genuine issue of material fact in this regard.

    ii. <u>Ms. Vasserman's other insurance – whether John Hancock would have issued the policy</u>

A misrepresentation is material if the insurer shows "that the misrepresentation induced it to accept an application that it might otherwise have refused." *Chicago Ins. Co.*, 265 F.Supp.2d at 342-43. The test "is not whether the company might have issued the policy even if the information

16

had been furnished; the question in each case is whether the company has been induced to accept an application which it might otherwise have refused." *New England Life Ins. Co. v. Taverna*, 2002 WL 718755 at * 9 (E.D.N.Y. Mar. 1, 2002). "Generally, materiality is a question of fact to be determined at trial; however, where the evidence concerning materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine." *Id.* (internal quotations omitted). When analyzing whether a particular misrepresentation is material, a court may look to evidence in the form of sworn affidavits of a qualifying underwriting agent who testified that the insurer would not have issued the particular contract if all facts had been disclosed, as well as underwriting guideline manuals and rules. *Id.* However, conclusory statements are insufficient, and an insurer must offer proof of its underwriting practices. *Sonkin Assoc. Inc. v. Columbian Mut. Life Ins. Co.*, 150 A.D.2d 764 (2d Dept. 1989). "Documentation, such as the insurance company's underwriting manuals, rules or bulletins, which pertain to insuring similar risks, should be submitted." *Wittner v. IDS Ins. Co. of New York*, 96 A.D.2d 1053 (2d Dept 1983).

In the present case, John Hancock submitted the underwriting policy that was in effect at the time that Ms. Vasserman applied for insurance, as well as the affidavits of Jeff Leutert and Ms. Duggan, to support its claim that it would not have issued the policy to Ms. Vasserman had it known of the misrepresentations included in her application.

Based on the underwriting policies in effect at the time of Ms. Vasserman's application, Mr. Leutert testified that, had John Hancock known that Ms. Vasserman already had $2 million of life insurance in force, John Hancock would have required Ms. Vasserman to verify income of at least $300,000 before issuing her the additional $1 million life insurance policy. Had Ms. Vasserman been unable to verify that level of income–which Ms. Vasserman could not have done based on her

17

actual income of less than $20,000–John Hancock would not have issued the policy. Ms. Duggan reviewed Mr. Leutert's affidavit and agreed with his analysis of John Hancock's underwriting policies. Duggan Aff. ¶ 1.

In an attempt to rebut John Hancock's evidence, Catchalova asserts that Ms. Duggan's deposition testimony undermines Mr. Leutert's affidavit by establishing that Ms. Duggan did not rely on the underwriting policies referenced in Mr. Leutert's affidavit. This assertion is not supported by the record. Ms. Duggan did not testify at her deposition that she failed to consult or rely upon the underwriting manual referenced by Mr. Leutert. Duggan Dep. 23. Ms. Duggan simply testified that she consulted another guideline, an age amount requirements chart, at some point during the underwriting of Ms. Vasserman's policy. *Id.* Ms. Catchalova, despite opportunity to do so, did not ask Ms. Duggan whether, in addition to the age amount requirements chart just described, Ms. Duggan also relied on the underwriting policies referenced in Mr. Leutert's affidavit. Accordingly, Ms. Duggan did not contradict her earlier affidavit in which she explicitly adopted Mr. Leutert's interpretation of John Hancock's underwriting guidelines and Mr. Leutert's conclusion that John Hancock would not have issued the policy if it had known of Ms. Vasserman's other insurance. Duggan Aff. ¶ 1.

For the reasons outlined above, John Hancock has established that it did not know that there were two other million-dollar insurance policies in force at the time of Ms. Vasserman's application and that it would not have issued its insurance policy if it had known of Ms. Vasserman's other insurance. Accordingly, because Ms. Catchalova has failed to raise a genuine issue of material fact in this regard, John Hancock has established that it is entitled to summary judgment.

      iii.      <u>Ms. Vasserman's income and occupation</u>

Because John Hancock has established the materiality of Ms. Vasserman's misrepresentations regarding the existence of other insurance, *i.e.*, that John Hancock did not know of Ms. Vasserman's other insurance and would not have issued her the policy if it had known, John Hancock has established that it is entitled to judgment as a matter of law on its rescission claim. Accordingly, the court need not address Ms. Vasserman's misrepresentations with regard to income and occupation.

## CONCLUSION

For the reasons outlined above, John Hancock's summary judgment motion as to its rescission claim is granted. The Clerk of Court is directed to enter judgment to John Hancock on its complaint. The case remains open as to Ms. Catchalova's wrongful death counterclaim. The parties are directed to inform the court in writing of the status of Ms. Catchalova's wrongful death claim in New York state court, as well as any outstanding claims against Mr. Perchikov in the present case, within thirty days.

      **SO ORDERED.**

      /s/
      **NINA GERSHON**
      **United States District Judge**

**Dated:**      **Brooklyn, New York**
            **April 16, 2008**